# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **SYLVESTER M. CHEATHAM,** | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:08cv00008 |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | By:   PAMELA MEADE SARGENT |
| Defendant. | ) | UNITED STATES MAGISTRATE JUDGE |

*I. Background and Standard of Review*

Plaintiff, Sylvester M. Cheatham, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claim for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 1381 *et seq.* (West 2003 & Supp. 2008).  This court has jurisdiction pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3).  This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B).  As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards.  *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning

Case 2:08-cv-00008-JPJ-PMS   Document 20   Filed 10/22/08   Page 1 of 23   Pageid#: 58

mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Cheatham protectively filed his application for SSI on April 26, 2006, alleging disability beginning February 25, 2005, due to work-related injuries, including back pain and leg weakness. (Record, ("R."), at 65-68, 72-73, 102.) The claim was denied initially and on reconsideration. (R. at 50-51, 52, 53-55.) Cheatham then requested a hearing before an Administrative Law Judge, ("ALJ"). (R. at 49.) The ALJ held a hearing on May 15, 2007, at which Cheatham was represented by counsel. (R. at 243-59.)

By decision dated June 21, 2007, the ALJ denied Cheatham's claim. (R. at 16-26.) The ALJ found that Cheatham had not engaged in any substantial gainful activity since his alleged onset date. (R. at 18.) The ALJ found that the medical evidence established that Cheatham had a severe impairment, namely a musculoskeletal impairment of the back, but he found that Cheatham's impairments did not meet or medically equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18.) The ALJ found that Cheatham's allegations regarding his limitations were not credible. (R. at 24.) The ALJ also found that

Case 2:08-cv-00008-JPJ-PMS   Document 20   Filed 10/22/08   Page 2 of 23   Pageid#: 59

Cheatham had the residual functional capacity to perform light work[1] with an occasional ability to climb, balance, stoop, kneel, crouch and crawl. (R. at 24.)[2] Based on Cheatham's age, education, work experience and residual functional capacity and the Medical-Vocational Guidelines, found at 20 C.F.R. Part 404, Subpart P, Appendix 2, ("the Grids"), the ALJ found that a significant number of jobs existed that Cheatham could perform. (R. at 25-26.) Therefore, the ALJ found that Cheatham was not under a disability as defined in the Act at any time through the date of his decision, and that he was not eligible for benefits. (R. at 26.) *See* 20 C.F.R. § 416.920(g) (2008).

After the ALJ issued his decision, Cheatham pursued his administrative appeals, (R. at 12), but the Appeals Council denied his request for review. (R. at 6-9.) Cheatham then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2008). The case is before this court on Cheatham's Motion for Summary Judgment filed July 23, 2008, and the Commissioner's Motion for Summary Judgment filed August 20, 2008.

---

[1] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can do light work, he also can do sedentary work. *See* 20 C.F.R. § 416.967(b) (2008).

[2] An occasional ability to climb, balance, stoop, kneel, crouch and crawl does not significantly diminish a claimant's ability to perform light work. *See* S.S.R. 85-15, WEST'S SOCIAL SECURITY REPORTING SERVICE (West 1992); *Smith v. Schweiker*, 719 F.2d 723, 725 (4th Cir. 1984).

## II. Facts

Cheatham was born in 1964, (R. at 65), which classifies him as a "younger person" under 20 C.F.R. § 416.963(c) (2008). He has a tenth-grade education and past relevant work experience as a machine operator.[3] (R. at 73, 77, 246.) Cheatham testified that he worked approximately six or seven weeks as a machine operator in 2005, stating that was the only job he had held in the previous 15 years. (R. at 247-48.) He testified that he suffered a work injury in 2005, for which he was receiving weekly workers' compensation benefits. (R. at 248.) Specifically, Cheatham stated that he suffered a groin injury and a low back injury that resulted in right leg pain and numbness, after being thrown into a railing by a forklift. (R. at 249.) He stated that the right side of his lower back hurt constantly, noting that he had received epidural steroid injections and had been prescribed medications in an effort to obtain relief. (R. at 249-50.) However, Cheatham testified that the injections provided only temporary relief. (R. at 250.) He also testified that he used an electrical stimulation unit once or twice weekly and that his doctor had recommended that he use a cane due to his right leg giving way. (R. at 250-51.) Cheatham stated that his right leg gave way occasionally, noting that he had actually fallen three times. (R. at 251.) Cheatham testified that his treating physician had recommended that he see a surgeon, but that had not been set up as of the time of the hearing. (R. at 251.)

Cheatham testified that his medication made him very sleepy and that he laid down most of the day. (R. at 252.) He stated that sitting and standing caused pain,

---

[3]Cheatham testified at his hearing that he could not remember if he completed the tenth grade. (R. at 256.)

estimating that he could both sit and stand for approximately 20 to 30 minutes at a time. (R. at 252.) Cheatham estimated that he could walk for approximately 20 to 30 minutes without interruption. (R. at 253.) He estimated that he could lift items weighing up to approximately 15 pounds, but further noted that he did not know whether this would cause his right side to "give out." (R. at 253.) He testified that he had difficulty gripping objects and had difficulty climbing stairs and bending at the waist. (R. at 253.) Cheatham stated that he had not had a driver's license since the early 1980s. (R. at 253-54.) He testified that his pain and his medications caused difficulty focusing. (R. at 254.)

Robert Jackson, a vocational expert, also was present and testified at Cheatham's hearing. (R. at 257.) Jackson testified that Cheatham's work as a machine operator, which appeared to have comprised, at most, eight weeks, would "barely" be considered relevant work. (R. at 257.) He classified this work as medium[4] and semiskilled. (R. at 257.) The ALJ noted that, under the Grids, an individual of Cheatham's age would not be able to perform any jobs if he had the limitations set forth in Dr. Waller's April 30, 2007, evaluation. (R. at 258.)

In rendering his decision, the ALJ reviewed records from Physicians Treatment Center; Virginia Baptist Hospital; Lynchburg General Hospital; Dr. Brenda S. Waller, M.D.; Dr. Thomas V. Schalcosky, D.O.; Dr. William Martin Jr., M.D., a state agency physician; Dr. Shawn B. Clark, M.D.; Dr. Richard L. Newton, M.D.; and Central Virginia Imaging. Cheatham's attorney submitted additional records from Dr. Waller

---

[4]Medium work involves lifting and carrying items weighing up to 50 pounds at a time with frequent lifting and carrying of items weighing up to 25 pounds. If someone can perform medium work, he also can perform light and sedentary work. *See* 20 C.F.R. § 416.967(c) (2008).

-5-

to the Appeals Council.[5]

Cheatham saw Dr. Leonard J. Cohen, M.D., at Physicians Treatment Center on February 25, 2005, after being struck by a forklift at work. (R. at 139.) Physical examination showed tenderness to palpation of the scrotum with no frank swelling, with traces of blood in his urine. (R. at 139.) He was diagnosed with a genital contusion and was given Phenergan and a Toradol injection. (R. at 139.) Cheatham was advised to remain off work until February 28, 2005, and Dr. Cohen imposed no limitations. (R. at 141.) On March 1, 2005, Cheatham returned to Physicians Treatment Center with complaints of worsened pain. (R. at 135-36.) He reported groin pain, as well as back pain, with some numbness and tingling of the left leg. (R. at 135.) Dr. Heidi Kind, D.O., noted that Cheatham was in so much pain, he had difficulty sitting, standing or moving in any way. (R. at 135.) Cheatham reported taking ibuprofen, which was not helping. (R. at 135.) A physical examination revealed that Cheatham was in acute painful distress. (R. at 135.) The right scrotum was slightly swollen and extremely tender to the touch, with the left scrotum less tender. (R. at 135.) No evidence of hernia was noted. (R. at 135.) Examination of Cheatham's spine was quite limited because he was unable to get off of the examination table. (R. at 135.) Cheatham refused another injection due to previous ill side effects. (R. at 135.) Dr. Kind diagnosed Cheatham with a genital contusion, rule out any intratesticular lesions on the right, and lower back pain with mild radiation into the legs. (R. at 135-36.) She prescribed Darvocet and Flexeril. (R. at

_____

[5]Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 6-9), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

135-36.)  An ultrasound of the scrotum revealed a moderate size left hydrocele.[6]  (R. at 137, 225.)  On March 4, 2005, Cheatham complained of continued significant pain. (R. at 133.)  Dr. Kind again diagnosed a genital contusion and a hydrocele.  (R. at 132-33.)  A CT scan of the pelvis was unremarkable.  (R. at 134, 227.)  He was advised to remain off work until he could be reevaluated.  (R. at 129.)  On March 11, 2005, Cheatham continued to complain of pain, and Dr. Kind again diagnosed a contusion to the groin and back.  (R. at 127.)  X-rays showed degenerative changes of both hip joints with medial and superior joint compartment narrowing, as well as scoliosis of the lumbar spine convex to the left.  (R. at 128, 226.)  Cheatham was advised to remain off work until March 18, 2005.  (R. at 130.)

On March 18, 2005, Cheatham stated that the swelling in his groin had decreased slightly, but he was still having some decreased discomfort.  (R. at 125.) He reported that his greatest problem was low right-sided back pain radiating into the leg.  (R. at 125.)  Cheatham stated that he was using a walker and that he had difficulty getting into the shower. (R. at 125.) Physical examination showed tenderness of the right paralumbar parasacral area and lateral thigh area. (R. at 125.) Dr. Cohen noted "[s]low steady improvement" with radicular pain into the right leg. (R. at 125.)  He ordered an MRI of the lumbar spine, noting that if this revealed positive results, Cheatham would be referred to a neurosurgeon.  (R. at 125.) Dr. Cohen diagnosed back pain with radiculopathy to the leg and excused Cheatham from work through March 25, 2005.  (R. at 125-26.)  On March 25, 2005, Cheatham reported feeling a little better.  (R. at 123.)  Dr. Kind noted that because an MRI was

---

[6]A hydrocele is a circumscribed collection of fluid.  *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 782 (27th ed. 1988).

scheduled for April 1, 2005, Cheatham was excused from work through April 2, 2005. (R. at 123-24.) The MRI showed a focal moderate sized foraminal and far lateral disc protrusion on the right side at the L4-5 level, producing some compromise of the neural canal at the L4-5 level. (R. at 122, 228.) On April 4, 2005, Dr. Matthew W. Tatom, M.D., with Physicians Treatment Center, prescribed Lortab and referred Cheatham to a neurosurgeon based on the MRI findings. (R. at 120.) Cheatham was excused from work pending his neurological evaluation. (R. at 121.)

Cheatham saw Dr. Shawn B. Clark, M.D., upon referral, on April 28, 2005. (R. at 217-18.) Cheatham complained of low back pain, right-sided groin pain and right lateral thigh pain to the knee. (R. at 217.) He denied any bowel, bladder or erectile dysfunction. (R. at 217.) Cheatham appeared uncomfortable with a very antalgic gait, but was in no distress. (R. at 217.) No clubbing, cyanosis or edema of the lower extremities was noted, and he had 5/5 strength in the upper and lower extremities with some breakaway weakness of the right lower extremity, knee extension and dorsi and plantar flexion. (R. at 217.) Straight leg raise testing was negative on the left, but produced hip pain on the right at 15 degrees and right thigh pain at 30 degrees. (R. at 217-18.) Dr. Clark noted that an MRI of the lumbar spine showed what appeared to be a far lateral right L4-5 disc bulge with approximately 50 percent foraminal stenosis. (R. at 218.) He diagnosed right L4 radiculopathy secondary to right L4-5 lateral disc bulge. (R. at 218.) A right L4-5 nerve root block was planned, and Dr. Clark excused Cheatham from work for three days following the nerve block. (R. at 218.)

On May 6, 2005, Dr. James Sublett Jr., M.D., performed an L4-5 epidural

steroid injection on the right, and Cheatham tolerated the procedure well. (R. at 147-48.) On May 31, 2005, Cheatham reported that the nerve root block provided a few weeks of good pain relief. (R. at 219.) However, he noted that his symptoms had returned, although not as strong as before. (R. at 219.) Cheatham also stated that he had been taking hydrocodone, which helped him "quite a bit," and he requested more. (R. at 219.) Physical examination revealed a slight limp to the right and positive straight leg raise testing, but Cheatham had good strength of the right lower extremity and normal reflexes. (R. at 219.) Dr. Clark diagnosed right L4 radiculopathy from right L4-5 far lateral disc herniation. (R. at 219) He stated that Cheatham had responded to conservative treatment thus far and was not interested in surgery until these failed. (R. at 219.) Dr. Clark planned to refer Cheatham to Dr. Murray Joiner, M.D., for comprehensive pain management and, possibly, a second L4-5 far lateral nerve root block. (R. at 219.) Dr. Clark stated that, should conservative treatment fail, he would like to see Cheatham back because he might need a right lateral L4-5 lumbar disckectomy. (R. at 219.) He excused Cheatham from work through June 10, 2005. (R. at 220.) Thereafter, this time was extended to June 13, 2005. (R. at 221.)

Cheatham's attorney sent a questionnaire to Dr. Waller on July 7, 2005. (R. at 229.) Dr. Waller indicated that Cheatham's diagnosis was herniated disc at the L4-5 level of the lumbar spine with radiculopathy. (R. at 229.) She opined that he was either disabled or on restrictions from February 25, 2005, through the date of the questionnaire, and she further opined that he could lift items weighing up to 10 pounds, but he could not bend, sit for prolonged periods or stand for greater than 15 minutes. (R. at 229.) The same questionnaire was sent to Dr. Clark, who diagnosed lumbar disc herniation at the L4-5 level. (R. at 230.) He opined that Cheatham was

-9-

either disabled or was on restrictions from April 28, 2005, through May 8, 2005, and from May 31, 2005, through June 10, 2005. (R. at 230.)

Dr. Waller administered another epidural steroid injection on July 12, 2005. (R. at 144.) Cheatham presented to the emergency department at Lynchburg General Hospital on September 2, 2005, with complaints of abdominal pain, associated with loss of appetite and nausea for several days. (R. at 153-65.) Lab work was ordered to screen for H. pylori, and Cheatham was prescribed Pepcid. (R. at 154-55.) A surgical abdominal series was unremarkable. (R. at 162.)

On July 27, 2006, Dr. William Martin Jr., M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment, finding that Cheatham could perform light work. (R. at 183-89.) Dr. Martin further found that Cheatham could occasionally climb, balance, stoop, kneel, crouch and crawl. (R. at 185.) He imposed no manipulative, visual, communicative or environmental limitations. (R. at 185-86.) Dr. Martin found Cheatham's statements to be partially credible. (R. at 188.)

Cheatham saw Dr. Waller on September 21, 2006, for a follow-up evaluation for the first time since November 2005. (R. at 199-200.) He reported no change in his condition, noting continued back pain and bilateral leg pain for most of the day. (R. at 199.) Cheatham stated that his pain was aggravated by bending, lifting, sitting, walking, climbing stairs, weather pressure and lying on his back. (R. at 199.) He stated that the pain was alleviated somewhat with heat. (R. at 199.) Cheatham reported taking only over-the-counter medications since he was not seeing any health

-10-

care professionals for medications. (R. at 199.) He stated that he remained unemployable due to back pain. (R. at 199.) Cheatham stated that epidural steroid injections were very effective, providing relief for approximately 90 days. (R. at 199.) Dr. Waller noted that Cheatham had a right limp with bilateral lower paraspinal muscle tenderness and moderately reduced extension, flexion and lateral motion bilaterally. (R. at 199-200.) He exhibited no misalignment or tenderness of the bilateral lower extremities, and he had a full range of motion with normal stability, strength and tone. (R. at 200.) Deep tendon reflexes were 2+/4 and symmetrical, and sensation was normal. (R. at 200.) Dr. Waller diagnosed displacement of a lumbar intervertebral disc without myelopath, as well as lumbago, noting that Cheatham's low back symptoms were unchanged. (R. at 200.) His then-current "working diagnosis" was spinal stenosis, spondylosis and a herniated disc. (R. at 200.) Cheatham stated that he was not ready for any other intervention at that time, and Dr. Waller scheduled him for another epidural steroid injection. (R. at 200.) Dr. Waller prescribed Ultram and discussed the benefits of exercise. (R. at 200.) Cheatham underwent another epidural steroid injection on October 3, 2006. (R. at 201.) When he saw Dr. Waller on October 19, 2006, he continued to complain of back and leg pain for a good part of the day with pain moving and changing positions. (R. at 203-04.) Cheatham reported that his pain was alleviated with medication and injections. (R. at 203.) He stated that while he was improved, he did not feel well enough to return to work. (R. at 203.) Findings on physical examination were the same as previously, except that no positive straight leg raise testing was indicated. (R. at 204.) Dr. Waller diagnosed displacement of a lumbar intervertebral disc without myelopath, as well as lumbago, noting that Cheatham's low back symptoms had improved. (R. at 204.) Dr. Waller stated that Cheatham's then-current "working diagnosis" was herniated disc and

spondylosis. (R. at 204.) She recommended exercise, prescribed Ultram and referred him for physical therapy. (R. at 204.)

When Cheatham saw Dr. Waller on December 18, 2006, he reported not doing well since his last visit, stating that he had fallen twice due to his right leg giving way. (R. at 205-06.) He further noted that his back pain had been more severe since the falls. (R. at 205.) Although physical therapy had been ordered, he stated that he did not attend because he was told to follow-up with his physician before starting such a program. (R. at 205.) Cheatham reported experiencing pain for most of the day. (R. at 205.) He reported relief with medications and heat, and he requested a repeat epidural steroid injection because they "help[ed] a great deal." (R. at 205.) Findings on physical examination were the same as previously, except Dr. Waller noted that Cheatham exhibited reduced extension of the right knee and reduced quadriceps strength. (R. at 206.) Dr. Waller's diagnoses remained unchanged. (R. at 206.) She noted that Cheatham's low back symptoms had worsened, and that his then-current "working diagnosis" was herniated disc and spinal stenosis. (R. at 206.) She indicated that no diagnostic testing was necessary at that time, but she increased his dosage of Ultram. (R. at 206.) Dr. Waller again discussed the benefits of exercise. (R. at 206.) Cheatham underwent another epidural steroid injection on January 2, 2007. (R. at 208.) When he saw Dr. Waller on January 16, 2007, he continued to complain of back pain for most of the day. (R. at 210-11.) Cheatham stated that he achieved pain relief with heat, medication and epidural steroid injections. (R. at 210.) Findings on physical examination remained unchanged, except Dr. Waller stated that Cheatham exhibited reduced tibialis anterior strength of the right leg. (R. at 210-11.) Dr. Waller again diagnosed displacement of the lumbar intervertebral disc without

-12-

myelopath and lumbago. (R. at 211.) She noted that Cheatham's low back symptoms were unchanged, and he was prescribed Ultram. (R. at 211.)

When Cheatham saw Dr. Waller on March 15, 2007, he reported medication seemed to help his back pain. (R. at 212-13.) He indicated that he had an appointment with Dr. Shaffrey at the University of Virginia later that month for an independent medical examination. (R. at 212.) Findings on physical examination were unchanged, and Dr. Waller diagnosed displacement of lumbar intervertebral disc without myelopath and lumbago. (R. at 213.) She noted that Cheatham's low back symptoms were unchanged, and his "working diagnosis" was spinal stenosis and spinal arthritis. (R. at 213.) Cheatham requested a repeat epidural steroid injection, noting that they "help[ed] a lot." (R. at 213.) He was prescribed Ultram and Lidoderm patches. (R. at 213.) Cheatham underwent another epidural steroid injection on April 3, 2007. (R. at 214.) When Cheatham saw Dr. Waller on April 11, 2007, he complained of low back pain and right leg pain. (R. at 215-16.) He reported no change since his last visit, and he stated that his last epidural steroid injection provided relief for only a few days. (R. at 215.) Findings on physical examination remained unchanged, as did Dr. Waller's diagnoses. (R. at 215-16.) Dr. Waller noted that Cheatham's low back symptoms were unchanged, and she prescribed Opana, Ultram and Lidoderm patches. (R. at 216.)

Dr. Waller completed a Physical Assessment Of Ability To Do Work-Related Activities on April 30, 2007, indicating that Cheatham could lift and/or carry items weighing up to 25 pounds occasionally and up to 10 pounds frequently. (R. at 232-33.) She indicated that these restrictions were due to back pain and stiffness. (R. at

-13-

232.)  Dr. Waller also opined that Cheatham could stand and/or walk for a total of two hours in an eight-hour workday, but that he could do so for only 15 minutes without interruption.  (R. at 232.)  She noted that these restrictions were due to Cheatham's leg pain and back pain.  (R. at 232.)  Likewise, Dr. Waller opined that Cheatham could sit for a total of two hours in an eight-hour workday, but that he could do so for only 15 minutes without interruption.  (R. at 232.)  She indicated that these restrictions were due to Cheatham's back pain and muscle spasms.  (R. at 232.)  Dr. Waller opined that Cheatham could occasionally climb, kneel and balance, but that he could never stoop, crouch or crawl.  (R. at 233.)  She further found that Cheatham's abilities to reach and to push/pull were affected by his decreased flexibility and lumbar degenerative disc disease at multiple levels of the spine.  (R. at 233.)  Dr. Waller also found that Cheatham should avoid heights, moving machinery and vibration, noting limitations in mobility and balance, as well as muscle weakness.  (R. at 233.)  However, Dr. Waller noted on the assessment as follows: "These are subjective opinions and not based on any functional capacity examination.  This is the recommended avenue for objective information."  (R. at 233.)

On May 9, 2007, Dr. Waller ordered physical therapy to treat Cheatham's low back pain.  (R. at 238.)  When Cheatham saw Dr. Waller on June 11, 2007, he reported some improvement with new medication.  (R. at 236-37.)  However, his mobility remained limited with bending, lifting, walking, sitting, standing, changes in weather pressure, cold, dampness, lying on his back and increased activity.  (R. at 236.)  Cheatham had a left limp and was walking with a cane.  (R. at 237.)  Findings on physical examination remained unchanged, as did Dr. Waller's diagnoses.  (R. at 237.)  Dr. Waller noted that Cheatham's low back symptoms had improved and were

-14-

"intermittent." (R. at 237.) His differential diagnosis included spondylosis and spinal arthritis. (R. at 237.) Dr. Waller again recommended exercise and prescribed Opana, Lidoderm patches and Ultram. (R. at 237.)

On August 9, 2007, Dr. Waller noted that Cheatham's low back symptoms had improved, but he still had persistent pain, stiffness and radicular pain down both legs. (R. at 239.) Cheatham stated that Opana worked well for his pain, but he stated that he did not take it daily because he felt like it was causing excessive sweating. (R. at 239.) Cheatham stated that his worst pain was in his right leg. (R. at 239.) Findings on physical examination remained unchanged, except Dr. Waller indicated that Cheatham had a normal gait. (R. at 239-40.) His low back symptoms were stable, and Dr. Waller recommended continued exercise. (R. at 240.) Cheatham's medications remained unchanged. (R. at 240.) Dr. Waller again referred Cheatham to physical therapy, and Cheatham stated that he had found a gym near his home where he would like to try to exercise. (R. at 240.) When Cheatham returned to Dr. Waller on October 9, 2007, he reported his pain as a six on a 10-point scale. (R. at 241-42.) Cheatham stated that he took Advil most of the day, only taking the Opana when the pain was "really bad." (R. at 241.) While he stated that this combination "work[ed] really well" for him, he noted that it caused sweating. (R. at 241.) Dr. Waller noted that Cheatham had a slow gait with a right limp and was using a cane. (R. at 242.) Findings on physical examination remained unchanged, as did Dr. Waller's diagnoses. (R. at 242.) Dr. Waller reported that Cheatham's low back symptoms were unchanged and were "intermittent." (R. at 242.) Cheatham's "working diagnosis" was spondylosis. (R. at 242.) He was advised to continue medications on an as needed basis, and Dr. Waller recommended that he exercise. (R. at 242.)

-15-

*III. Analysis*

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. § 416.920 (2008); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a) (2008).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2008); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated June 21, 2007, the ALJ denied Cheatham's claim. (R. at 16-26.) The ALJ found that Cheatham had not engaged in any substantial gainful activity

-16-

since his alleged onset date. (R. at 18.) The ALJ found that the medical evidence established that Cheatham had a severe impairment, namely a musculoskeletal impairment of the back, but he found that Cheatham's impairments did not meet or medically equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18.) The ALJ found that Cheatham's allegations regarding his limitations were not credible. (R. at 24.) The ALJ also found that Cheatham had the residual functional capacity to perform light work with an occasional ability to climb, balance, stoop, kneel, crouch and crawl. (R. at 24.) Based on Cheatham's age, education, work experience and residual functional capacity and the Grids, the ALJ found that a significant number of jobs existed that Cheatham could perform. (R. at 25-26.) Therefore, the ALJ found that Cheatham was not under a disability as defined in the Act at any time through the date of his decision, and that he was not eligible for benefits. (R. at 26.) *See* 20 C.F.R. § 416.920(g).

Cheatham argues that the ALJ erred in his weighing of the medical evidence in determining that he was not disabled. (Plaintiff's Brief In Support Of Motion For Summary Judgment), ("Plaintiff's Brief"), at 7-13.) Specifically, Cheatham argues that the ALJ erred by failing to accord proper weight to the opinions of his treating physician, Dr. Waller, instead relying on the opinion of the state agency physician. (Plaintiff's Brief at 7-13.) For the following reasons, I find Cheatham's argument unpersuasive.

The ALJ in this case accorded little weight to the opinion of Dr. Waller that Cheatham could sit and stand/walk for a total of two hours in an eight-hour workday, but for only 15 minutes without interruption, because it was based on Cheatham's

subjective allegations and because it was not supported by the record.  (R. at 23.)  For the following reasons, I find that substantial evidence supports such a weighing of the evidence.  It is well-settled that the ALJ must consider objective medical facts and the opinions and diagnoses of both treating and examining medical professionals, which constitute a major part of the proof of disability cases.  *See McLain*, 715 F.2d at 869. The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability.  20 C.F.R. § 416.927(d)(2) (2008).  However, "circuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)).  "[I]f a physician's opinion is not supported by the clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight."  *Craig*, 76 F.3d at 590.

In an April 30, 2007, assessment, Dr. Waller opined that Cheatham could lift and/or carry items weighing up to 25 pounds occasionally and up to 10 pounds frequently.  (R. at 232.)  She further opined that Cheatham could both sit and stand/walk for a total of two hours in an eight-hour workday, but could do so for only 15 minutes without interruption.  (R. at 232.)  She found that he could never stoop, crouch or crawl, but could occasionally climb, kneel and balance.  (R. at 233.)  Dr. Waller found that Cheatham's abilities to reach and to push/pull were limited.  (R. at 233.)  Finally, Dr. Waller opined that Cheatham should not work around heights, moving machinery and vibration. (R. at 233.) By contrast, the state agency physician, Dr. Martin, found in July 2006, that Cheatham could perform light work, including the abilities to sit and stand/walk for a total of about six hours in an eight-hour

-18-

workday with normal work breaks and to occasionally climb, balance, stoop, kneel, crouch and crawl. (R. at 184-85.) Cheatham argues that the state agency physician did not have the benefit of reviewing Dr. Waller's April 30, 2007, assessment in making his residual functional capacity finding. (Plaintiff's Brief at 8.) Of course this is true since the state agency physician made his residual functional capacity finding before Dr. Waller. However, the undersigned finds that had Dr. Martin had Dr. Waller's assessment before him, it would not have changed his findings. First, although Dr. Martin did not have the benefit of reviewing Dr. Waller's assessment, he did have some of Dr. Waller's treatment notes which indicated that Cheatham had a right leg limp, bilateral lower paraspinal muscle tenderness, moderately reduced extension and flexion, moderately reduced bilateral motion bilaterally, no misalignment or tenderness of the left leg, with a full range of motion, normal stability, strength and tone, reduced extension of the right knee, grossly intact cranial nerves, 2+/4 and symmetrical deep tendon reflexes and normal sensation. (R. at 188.) These are the same findings on physical examination noted by Dr. Waller throughout her treatment of Cheatham. Thus, while the state agency physician might not have had the benefit of reviewing Dr. Waller's April 30, 2007, assessment, he did have the benefit of reviewing Dr. Waller's physical examination findings that were contemporaneous with the April 30, 2007, assessment, and which would not support such restrictive findings. However, even more importantly, Dr. Waller herself admitted that the findings contained in her assessment were subjective opinions not based on any functional capacity examination, which she indicated was the "recommended avenue for objective information." (R. at 233.)

In addition, Dr. Waller's assessment is inconsistent with other substantial

evidence of record, including Cheatham's treatment history, his failure to participate in physical therapy as recommended and his failure to pursue surgical options. The court first notes that Cheatham has been treated rather conservatively with various medications, assistive devices and epidural steroid injections, with good results. For instance, Cheatham reported that a nerve root block administered in May 2005, provided a few weeks of good pain relief and, even though his symptoms returned, they were not as strong as before. (R. at 219.) Also in May 2005, Dr. Clark noted that Cheatham had responded to conservative treatment thus far, but he informed Cheatham that should conservative treatment fail, he would like to see him back to discuss surgery. (R. at 219.) In September 2006, Cheatham stated that his pain was alleviated somewhat with heat, he reported taking only over-the-counter medications at that time, and he stated that epidural steroid injections were very effective, providing relief for approximately 90 days. (R. at 199.) He stated that he was not ready for any other intervention at that time. (R. at 200.) Again, in October 2006, Cheatham reported that his pain was alleviated with medication and injections. (R. at 203.) In December 2006, Cheatham reported relief with medications and heat, and he requested yet another epidural steroid injection, as they "help[ed] a great deal." (R. at 205.) In January 2007, Cheatham reported pain relief with heat and medication, and he requested another epidural steroid injection. (R. at 210.) In March 2007, Cheatham stated that medication seemed to help his back pain. (R. at 212-13.) He again requested another epidural steroid injection, noting that they "help[ed] a lot." (R. at 213.) In April 2007, Cheatham noted that the epidural steroid injection, administered that month, provided relief for only a few days. (R. at 215.) However, in June 2007, Cheatham reported improvement with a new medication. (R. at 236.) In August 9, 2007, Cheatham reported that Opana worked well for his pain. (R. at

-20-

239.)  In October 2007, Cheatham stated that a combination of Advil and Opana "work[ed] really well" for him.  (R. at 241.)  It is well-settled that "[i]f a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986).

Also, as the ALJ noted in his decision, there was a greater than 10-month interval, during the period that Cheatham alleges disability, that he did not seek any medical treatment whatsoever, including prescribed medications or epidural steroid injections.  Moreover, when Cheatham returned to treatment following this lengthy absence, his symptoms had not worsened, and in June 2007 and October 2007, Dr. Waller even described Cheatham's symptoms as "intermittent."  (R. at 237, 242.)  As alluded to above, there are notations in the record that Cheatham was referred to physical therapy.  (R. at 204, 238, 240.)  However, it appears that he never followed through with this recommendation.  Finally, Dr. Clark informed Cheatham to return to see him to discuss his surgical options if he felt conservative treatment was no longer working to control his symptoms.  (R. at 219.)  However, although Cheatham now alleges disability, there is no indication in the record that he ever returned to Dr. Clark or any other medical professional to discuss surgical options in an effort to alleviate his symptoms.  Thus, for all these reasons, the court finds that Cheatham's treatment history is inconsistent with the degree of limitation and pain that he alleges.

For all of the above-stated reasons, the undersigned finds that substantial evidence supports the ALJ's weighing of the medical evidence.  In particular, the court finds that the ALJ properly accorded Dr. Waller's April 30, 2007, physical assessment little weight, instead relying upon the assessment of the state agency

physician in determining Cheatham's residual functional capacity.

Based on my findings above, I recommend that the court deny Cheatham's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the final decision of the Commissioner denying benefits.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists to support the ALJ's weighing of the evidence;

2. Substantial evidence exists to support the ALJ's finding as to Cheatham's physical residual functional capacity; and

3. Substantial evidence exists to support the ALJ's finding that Cheatham was not disabled under the Act.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Cheatham's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the final decision of the Commissioner denying benefits.

-22-

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(c) (West 2006):

> Within ten days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 10 days could waive appellate review. At the conclusion of the 10-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Chief United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     This 22nd day of October 2008.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE